**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-23152-CIV-SIMONTON**

REBECCA ANN ZERBA,

        Plaintiff,

 v.

CAROLYN W. COLVIN, Acting Commissioner
of Social Security Administration,

        Defendant.

_____/

<u>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT</u>

      This matter is before the Court on the cross-motions for summary judgment filed

by Plaintiff Rebecca Ann Zerba ("Plaintiff") and by Defendant Carolyn W. Colvin,

("Defendant"), Acting Commissioner of Social Security Administration, ECF Nos. [21]

[24].[1] Based upon the consent of the parties, the Honorable Kathleen M. Williams, United

States District Judge, has referred the matter to the undersigned to take all necessary and

proper action as required by law, through and including trial by jury and entry of final

judgment, ECF No. [18].  The summary judgment motions are now ripe for disposition.

      For the reasons stated below, the undersigned hereby **DENIES** the Plaintiff's

Motion, ECF No. [32], and **GRANTS** the Defendant's Motion for Summary Judgment, ECF

No. [24].

---

[1] On January 23, 2017, Nancy A. Berryhill replaced Carolyn W. Colvin as the Acting
Commissioner of the Social Security Administration.  Pursuant to Federal Rule of Civil
Procedure 25(d), Nancy A. Berryhill is automatically substituted as the Defendant in this
case.

## I. PROCEDURAL BACKGROUND

On September 27, 2012, the Plaintiff filed a Title II application for a period of disability and disability insurance benefits. (R. 200).[2]  On February 11, 2013, the Plaintiff also filed a Tittle XVI application for supplemental security income. (R. 205)  In both applications, the Plaintiff alleged disability beginning May 2, 2011 (R. 200, 206).[3] The claims were denied initially on March 8, 2013, and upon reconsideration on June 19, 2013. (R. 131-144, 147-156). On October 2, 2014, a hearing was held in front of an Administrative Law Judge ("ALJ") in Miami, Florida. (R. 47-79). At the hearing, the ALJ heard testimony from an impartial vocational expert ("VE"), Steve Bast, the Plaintiff, who was represented by counsel, and the Plaintiff's husband. (R. 47-79). On November 19, 2014, the ALJ concluded that the Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act from May 2, 2011, through the date of the decision, pursuant to 20 CFR §§ 404.1520(f) and 416.920(f). (R. 21).

The Plaintiff requested review from the Social Security Administration Appeals Council, which denied review on June 19, 2013. (R.147-156).  Having exhausted all administrative remedies, Plaintiff timely filed the pending Complaint seeking judicial review of the administrative proceedings pursuant to 42 U.S.C. §405(g). ECF No. [1].

## II. LEGAL ISSUES PRESENTED

The Plaintiff asserts that the ALJ committed the following errors, in determining that she was not disabled.

1. The ALJ failed to properly consider and appropriately analyze all relevant evidence.

---

[2] The letter "R", followed by a page number is used to designate a page in the Administrative Record, which is contained in ECF No. [15].

[3] While the ALJ's decision and both the Plaintiff and Defendant list the alleged onset date as May 2, 2011, the applications indicate an alleged onset date of January, 2006. Because this date does not impact the undersigned's analysis the undersigned accepts the date offered by the parties.

2. The ALJ improperly discounted the combined opinions of treating psychiatrist, Dr. Priscilla Borrego, and treating ARNP, Ms. Pauline Peterkin, without providing sufficient justification.

3. The ALJ's functional assessment was not supported by substantial evidence or by either a treating or medical source.

4. The ALJ posed incomplete and erroneous hypothetical questions to the VE.

5. The ALJ erred by not finding disability based upon the testimony of the vocational expert.

6. The ALJ's credibility analysis was not properly documented or conducted at the proper time

ECF No. [21]

### III. PLAINTIFF'S BACKGROUND AND MEDICAL HISTORY

#### A. Background

Plaintiff was born on March 4, 1960. (R. 199). The Plaintiff lived with her grandmother and left home at age 16. (R. 54). The Plaintiff has a tenth grade education and past work experience as a factory worker, cashier, deli worker, and animal caretaker at a veterinary office. (R.60-61)

#### B. Medical History

The ALJ found that the Plaintiff had the following physical impairments: liver disorder, hepatitis, osteoarthritis, hypertension, back disorder, and obesity. (R. 23). However, the Plaintiff asserts in her Motion that she does not attribute any significant problems to her liver disease, hypertension, and heart impairment. ECF No. [21] at 19. Therefore it is not necessary for the undersigned describe medical records related to those impairments. Additionally, at the hearing before the ALJ, counsel for the Plaintiff stated that while the Plaintiff asserts that she suffers from certain spinal impairments, the Plaintiff's "basic major thing is her schizoaffective disorder and her generalized

anxiety disorder with panic attacks, depression, poor memory, poor concentration, auditory hallucinations, some visual hallucinations at time, persecutory delusions." (R. 51). The Plaintiff also stated in her Motion that she is "not currently experiencing significant complications from her spinal impairments." ECF No. [21] at 14.

As related to the Plaintiff's back pain, treatment notes from Jackson Hospital show that the Plaintiff was diagnosed on September 11, 2011, with bilateral spondylosis with anterior slippage as well as degenerative disc space disease. (R. 352). However, the treatment notes reflect that when she was seen by Dr. Mayorga throughout 2012, she was not in acute distress and her back inspection was within normal limits. (R.410, 415, 420, 425, 430, 435, 440, 445).

As related to the Plaintiff's mental impairments, the Plaintiff was primarily seen by ARNP, Pauline Peterkin who was supervised by Dr. Borrego at Community Health of South Florida. (R. 370-407, 598-620, 716-718).

On October 4, 2011, the Plaintiff was seen at Community Health of South Florida, and reported anxiety attacks. (R. 609). The Plaintiff reported being stressed due to unemployment. (R. 609). The Plaintiff was diagnosed with generalized anxiety disorder and was found to be well-groomed, cooperative, anxious, and alert. (R. 610). The evaluation notes that the Plaintiff's memory, cognition, concentration, and abstraction were intact, her speech was coherent, and her thought process was goal directed. (R. 610). The Plaintiff was found to have fair insight and judgment, and it was noted that the Plaintiff was able to care for herself. (R. 610).

On January 25, 2012, the Plaintiff was seen and reported that medication reduced her anxiety level, and that she was feeling less depressed, and was "creating more projects to do." (R. 370). It was reported that her appearance was well groomed, her eye contact was fair, she was cooperative, had a congruent affect, was orientated, and her memory and concentration were intact. (R. 370). The notes also show that the Plaintiff's

thought process was goal directed, she was not experiencing delusions, and her insight and judgment were considered "fair." (R. 371).

On February 24, 2012, the Plaintiff reported having anxiety attacks despite medication, and feeling anxious due to financial problems. (R. 372). The Plaintiff was found to be cooperative, anxious, depressed, and alert. (R. 372). The Plaintiff's recent memory was found to be impaired, and her speech was found to be coherent and soft. (R. 372).

On March 23, 2012, the Plaintiff reported doing much better and "getting up and doing things" along with more interaction with people. (R. 374). The Plaintiff reported gardening every day and sleeping well. (R. 374). The Plaintiff was found to be cooperative, alert, and her memory was found to be improved. (R. 374).

On April 30, 2012, the Plaintiff reported agitation and feeling stressed, and reported that she was having difficulty concentrating and was not able to drive as a result of panic attacks. (R. 376). The Plaintiff's memory and concentration were found to be impaired. (R. 376).

On May 31, 2012, the Plaintiff reported "doing ok" and "keeping busy working in the garden and caring for her dogs." (R.378). Her mood was found to be less anxious and her memory was intact. (R. 378). The report notes that her concentration was impaired. (R. 378).

On July 10, 2012, the Plaintiff reported that she had good and bad days, and reported that she felt nervous and stressed. (R. 380). The Plaintiff stated that she felt stress when she was alone. (R. 380). The Plaintiff's mood was found to be anxious, she was well-groomed and alert and her memory was found to be intact. (R. 380). Her concentration was found to be impaired. (R. 380). The Plaintiff did not report any hallucinations or delusions, and was found to be able to care for herself. (R. 381).

On August 28, 2012, the Plaintiff reported having anxiety attacks, being nervous, and being bored and lonely when she was alone at home.  (R. 382).  The Plaintiff was found to be guarded, depressed, and anxious.  (R. 382).  The progress notes indicate that the Plaintiff's orientation was intact however her memory and concentration were impaired.  (R. 382). The Plaintiff reported no hallucinations but did report persecutory delusions and her insight and judgment were found to be fair.  (R. 383).

When the Plaintiff returned on October 16, 2012, she reported feeling much better, and stated that she was feeling less anxious and depressed, and had been more outgoing, and planned to go walking with her neighbor.  (R. 384).  The progress notes show that the Plaintiff was cooperative, less depressed, less anxious, and her memory and concentration were intact.  (R. 384).

Again on January 24, 2013, the Plaintiff reported feeling much better, and having a "positive approach to life."  (R. 387).  The Plaintiff also reported that she had less anxiety since she "went back to Klonopin."  (R. 386).  The Plaintiff was found to be less depressed and anxious and her memory and concentration were intact.  (R. 386).

The next record at Community Health is dated August 22, 2013, and the Plaintiff reported feeling very depressed with low energy and paranoia.  (R. 696). The Plaintiff reported mood swings, anger, and outburst.  (R. 696).  The Plaintiff was found to be cooperative, fearful, depressed, and anxious.  (R. 697).  The Plaintiff reported hallucinations and delusions and her memory and concentration as found to be impaired.  (R. 697).  The notes also indicate that the Plaintiff was able to care for herself with supervision. (R. 697).

Again on November 6, 2013, the Plaintiff reported feeling very depressed, anxious, nervous, and paranoid.  (R. 694).  The Plaintiff stated that she was afraid to leave the home, had not slept in three days, and that her husband had to remind her to take a shower.  (R. 694).  The Plaintiff was found to be cooperative, depressed, anxious, and

fearful. (R. 694). The Plaintiff's speech was coherent, and she was found to have impaired memory and concentration. (R. 694). The Plaintiff's thought process was found to be goal directed although she was found to be experiencing racing thoughts, auditory hallucinations and persecutory delusions. (R. 695). The Plaintiff's insight was noted as fair and her judgment was poor. (R. 695). The notes indicate that the Plaintiff was not able to care for herself, and she required supervision. (R. 695).

On January 23, 2014, the Plaintiff reported that her medication helped, and while her mood was found to be depressed and anxious, the Plaintiff's memory, concentration, and orientation were intact. (R. 691).

When the Plaintiff returned on April 16, 2014, the Plaintiff reported that she had been out of her medication for three weeks, and was feeling very anxious, nervous, and shaky. (R. 693). The Plaintiff reported sleeping and eating well, however she stated that she was still not able to drive because she was scared she would forget where she is going. (R. 693). The Plaintiff was found to be cooperative an alert. (R. 693). Her mood was depressed and anxious and her memory and concentration were found to be impaired. (R. 696).

On May 29, 2014, the Plaintiff's mood was noted as being depressed and anxious. (R. 598). Her orientation, memory, and concentration were intact, she was cooperative, and reported no hallucinations or delusions. (R. 599). Her insight and judgment were found to be fair. (R. 599).

The last progress note from Community Health is dated August 22, 2014. (R. 716). The Plaintiff reported feeling very depressed, and lacking memory, concentration, and focus. (R. 716). The Plaintiff stated that she had to be reminded to take showers, eat, and take her medications. (R. 716). The Plaintiff was found to be cooperative, her affect was congruent, and she was alert and orientated to person and place. (R. 716). The Plaintiff was also found to have impaired concentration and memory along with

persecutory delusions.  (R. 716-717).  The Plaintiff's thought process was goal directed, and she was able to care for herself.  (R. 717).

   C.  <u>Hearing Testimony</u>

   1.  <u>Plaintiff's Testimony</u>

An administrative hearing was conducted on October 2, 2014, in Miami, Florida, attended by the Plaintiff, her husband, and the Plaintiff's counsel. (R. 47-79). Steve Batch, an impartial vocational expert, also testified at the hearing. The Plaintiff testified that she was abused by her grandmother as a child, which caused her emotional pain.  (R. 54). The Plaintiff testified that the last job she had was at a veterinarian's office where she cared for animals.  (R. 55).  She reported that she was let go from the job and has not tried to find a new job as she can't drive.  (R. 55).  The Plaintiff testified that she cannot drive because she gets panic attacks and has to pull off the side of the road.  (R. 55).  The Plaintiff explained that she received treatment from ARNP Pauline Peterkin who is supervised by Dr. Priscilla Borrego.  (R. 55).  The Plaintiff testified that she first saw Ms. Peterkin on a monthly basis and then every six weeks.  (R. 55).  The Plaintiff stated that Ms. Peterkin prescribed medication, and the Plaintiff reported taking three medications including Klonopin.  (R. 56).  The Plaintiff reported that the medications help her although she reported that she still gets anxiety attacks three to four times per week.  (R. 56-57). The Plaintiff stated that the medication starts working within twenty minutes.  (R. 56). The Plaintiff also reported that she is depressed, and has some good days and some bad days, and is taking medication.  (R. 57).  The Plaintiff testified that she cries a lot and does not want to do anything and is not able to concentrate well enough to read.  (R. 57). The Plaintiff explained that her typical day consists of waking up in the morning and taking her medication (after her husband provides it for her), and then she takes care of the animals, and takes care of her little chores and then sleeps on the sofa until twelve or one.  (R. 58).  The Plaintiff contends that her husband has to remind her to take care of

the animals because she forgets to feed her landlord's horse. (R. 58). The Plaintiff stated that her husband calls her at noon to wake her up and to make sure that she eats. (R. 58). The Plaintiff testified that she eats cereal for lunch, and during the time between lunch and dinner she watches television. (R. 59). The Plaintiff reported that she gets anxious when she is sitting up and it is better when she is lying down. (R. 59-60). In the evening she watches television with her husband and goes to bed at 10:00. (R. 60). The Plaintiff testified that there is something wrong with her right knee and it pops, she has to wear a brace, and needs assistance to get back up when she squats down. (R. 60). The Plaintiff also stated that she had pain in her lower back that is "not that bad" and "comes and goes." (R. 60). In terms of her prior work experience, the Plaintiff testified that when she was working for the veterinary office, she was walking most of the time and used to bathe and walk the dogs. (R. 60). The Plaintiff stated that when she was a cashier, factory worker, and waitress, she stood most of the time. (R. 61).

2.  Scott Sewell—Husband of the Plaintiff

The Plaintiff's husband was questioned by the Plaintiff's counsel. (R. 62-66). Mr. Sewell stated that they had been married for three years and during their marriage Mr. Sewell has felt more like a caretaker. (R. 62). Mr. Sewell testified that the Plaintiff loses concentration and is unable to complete household chores. (R. 62). Mr. Sewell testified that he has to call to check on the Plaintiff to make sure that the Plaintiff is taking care of herself, including reminding the Plaintiff to shower. (R. 63). Mr. Sewell explained that on a typical Saturday, he encourages the Plaintiff to go grocery shopping and the Plaintiff says she does not want to go. (R. 64). While at the store, the Plaintiff will ask to go home after twenty minutes. (R. 64). Mr. Sewell stated that the Plaintiff has not driven in two years because the last time the Plaintiff drove, the Plaintiff had a "meltdown," forgot where she was going, and Mr. Sewell had to pick her up. (R. 64). Mr. Sewell testified that after shopping, he has to put all of the groceries away because the Plaintiff disappears.

(R. 65). In terms of the Plaintiff's moods, Mr. Sewell testified that that the Plaintiff goes

from being very happy and engaged in conversation to being close to tears within five or

ten minutes. (R. 65). Mr. Sewell stated that the Plaintiff has a few good days here and

there, although the Plaintiff has been unable to keep to a routine regarding any

household chores. (R. 66). Mr. Sewell reported that he and the Plaintiff have been

together for eleven years, and the Plaintiff started to get worse after she stopped driving.

(R. 67).

### 3. Vocational Expert Testimony

The VE, Mr. Bast, testified that the Plaintiff did not have any job skills from the

animal caretaker job that were transferable to light or sedentary work. (R. 72). The VE

was presented with the following hypothetical:

> Please assume an individual, same age, education, past work
> experience as the claimant. Further assume such individual
> would be limited to medium exertion work as described in the
> Dictionary of Occupational Titles. Additionally, assume such
> an individual could not climb ladders, ropes or scaffolds;
> could only occasionally climb ramps or stairs. Could not
> crawl. Would be unable to perform complex and detailed
> tasks due to limitations in concentration, persistence and
> pace, but could perform simple, routine, competitive,
> repetitive tasks on a sustained basis over a normal eight hour
> work day with no more than simple decision-making required.
> And is capable of interacting appropriately with supervisors
> and occasionally with co-workers and the public despite
> limitations in social functioning.

(R. 72-73)

The VE responded that such an individual would not be capable of performing the

Plaintiff's past work as an animal caretaker but that there are jobs in the national

economy that such an individual could perform: kitchen helper, hospital cleaner, and

industrial cleaner. (R. 75). When presented with a hypothetical where the individual

would be absent from work more than four times a month and also would be off task

more than 50 percent of an eight hour workday, the VE responded that all work would be eliminated. (R. 76).

## IV. LEGAL FRAMEWORK

### A. Standard of Review

Judicial review of the ALJ's decision in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's factual findings and whether the correct legal standards were applied. 42 U.S.C. section 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Bloodworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

When reviewing the evidence, the Court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence "preponderates" against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Baker v. Sullivan*, 880 F.2d 319, 321 (11th Cir. 1989). This restrictive standard of review, however, applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law, which are reviewed *de novo*, including the determination of the proper standard to be applied in reviewing claims. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991) ("The Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."); *Martin v. Sullivan*, 894 F.2d at 1529.

## B. The Five Step Sequential Analysis

The Social Security Administration applies a five-step sequential analysis to make a disability determination. 20 C.F.R. §§ 404.1520(a), 416.920(a). The analysis follows each step in order, and the analysis ceases if, at a certain step, the ALJ is able to determine, based on the applicable criteria that the claimant is disabled, or that the claimant is not disabled.

### 1. Step One

Step one is a determination of whether the claimant is engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b), 416.972(b). If an individual has been participating in substantial gainful activity, he or she will not be considered disabled, regardless of physical or mental impairment, despite the severity of symptoms, age, education, and work experience. *Id.* The analysis proceeds to step two if the individual is not engaging in substantial gainful activity.

In the case at bar, the ALJ found that Plaintiff had not engaged in substantial activity since May 2, 2011, the alleged onset date. (R. 23).

### 2. Step Two

At the second step, the claimant must establish that she has a severe impairment. 20 C.F.R. 404.1520(c). The ALJ must make a severity determination regarding the claimant's medically determinable impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c). "There is no need for an ALJ to identify every severe impairment at step two." *Tuggerson-Brown v. Commissioner of Social Security*, No. 13-14168, 2014 WL 3643790, at *2 (11th Cir. Jul. 24, 2014). At step two the ALJ found that The ALJ found that the Plaintiff had the following severe impairments: liver disorder,

affective mood disorder, anxiety disorder, osteoarthritis, hypertension, back disorder, and obesity. (R. 23).   The ALJ also noted a history of alcohol abuse but took note that "despite her history of alcohol abuse for  years, the claimant was able to engage in work activity at the substantial activity level in the past… the materiality of the claimant's substance abuse is not an issue, and no 'material' determination is needed."  (R. 24). Because the ALJ found that the Plaintiff had at least one severe medically determinable impairment or combination of impairments, the process advanced to the third step.

### 3. Step Three

The third step required the ALJ to consider if the Plaintiff's impairment or combination of impairments was at the level of severity to either meet or medically equal the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app.1.  (commonly referred to as the "Listings").  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.  A Plaintiff is considered to be disabled if her impairment or combination of impairments: 1) is severe enough to meet or to medically equal the criteria of a listing; and, 2) meets the duration requirement under 20 C.F.R. §§ 404.1509, 416.909.

Here, the ALJ found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impartments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 24). The Plaintiff challenges the ALJ's consideration of the Plaintiff's mental impairments at this step. The Plaintiff does not contend that she meets a Listing, but disputes the evaluation of the severity of her mental impairment, which was used as part of the Residual Functional Capacity analysis.

### 4. Step Four

Step four is a two-pronged analysis that involves a determination of whether the impairments prevent the Plaintiff from performing her past relevant work.  First, the ALJ

must make a determination of the Plaintiff's Residual Functional Capacity ("RFC") as described in 20 C.F.R. §§ 404.1520(e), 416.920(e).  RFC measures a person's ability to do physical and mental work activities on a sustained basis despite limitations caused by his impairments.  In making this determination, the ALJ must consider all of the claimant's impairments, regardless of the level of severity. 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945; SSR 96-8p; *Tuggerson-Brown,* 2014 WL 3643790, at *2 (an ALJ is required to consider all impairments, regardless of severity, in conjunction with one another in performing the latter steps of the sequential evaluation).

The ALJ found that the Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except that the Plaintiff cannot climb ladders, ropes or stairs.  She cannot crawl, and is unable to complete complex and detailed tasks, due to limitations in concentration, persistence and pace.  However, the ALJ found that the Plaintiff could perform simple, routine, and repetitive tasks on a sustained basis over a normal eight-hour workday, and would need a job with no more than simple decision making required. (R. 27).  The ALJ also found that despite limitation in social functioning, the Plaintiff is capable of interacting appropriately with supervisors and occasionally with co-workers and the public. (R. 28).

The second phase of step four required the ALJ to make a determination of whether the Plaintiff had the RFC to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f).  Relevant work has been defined as work performed within the last 15 years and performed long enough so that 1) the claimant could learn to do the job; and, 2) be considered substantial gainful activity.  20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965.  During the second part of step four, the ALJ made the determination that the Plaintiff was unable to perform any past relevant work.  (R. 39).  The ALJ then proceeded to the fifth and final step.

5. <u>Step Five</u>

If the claimant is not able to perform his past relevant work, the ALJ progresses to the fifth step. At this step, the burden of production shifts to the Commissioner to show that other work that Plaintiff can perform exists in significant numbers in the national economy. *Jones v. Apfel*, 190 F.3d 1224, 128 (11th Cir. 1999); 20 C.F.R. §§ 404.1520(g), 416.920(a)(4)(v). In making this determination, the ALJ considers a claimant's RFC, age, education, and work experience to determine if the claimant can perform any other work. If the claimant can perform other work, the ALJ will make a finding that the claimant is not disabled.

At this step, the ALJ considered Plaintiff's age, education, work experience, RFC, and, based on the testimony of the VE, found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including kitchen helper, hospital cleaner, and cleaner-industrial. (R. 40)

The Plaintiff challenges this step of the analysis, arguing that the ALJ did not properly give the VE a complete hypothetical that included the Plaintiff's mental limitations in daily activities; social functioning, and concentration, persistence or pace.

V.     <u>LEGAL ANALYSIS</u>

A.     <u>Plaintiff's Argument Regarding the ALJ's Analysis of all Relevant Evidence</u>

The Plaintiff asserts that the ALJ failed to consider and assess all of the Plaintiff mental impairments as part of the ALJ's step 3 and 4 evaluation as he is legally required to do. The Plaintiff asserts that the ALJ impermissibly substituted his opinion for that of the treating physicians. The Plaintiff contends that the ALJ's decision hinges entirely on the ALJ's depiction of the Plaintiff's mental status examinations being unremarkable, and as such, the ALJ improperly determined that the Plaintiff's mental impairments were not as severe as opined by the Plaintiff's mental health care providers. The Plaintiff asserts that that ALJ selectively considered the evidence in order to support the ALJ's

conclusion, particularly in regard to his findings of moderate limitations in activities of daily living, social functioning, and concentration, persistence and pace. The Plaintiff contends that the report the ALJ relies upon is inappropriate because one of the reports was a second hand recitation of the Plaintiff's comments to the Commissioner's staff and the report is contrary to first hand reports given by the Plaintiff two months later.

The Defendant asserts that the ALJ properly evaluated the Plaintiff's impairments by weighing the opinion of ARNP Peterkin and citing to evidence in the record in support of the ALJ's conclusion. The Defendant also asserts that there is no evidence that the second hand report relied upon by the ALJ was inaccurate. The Defendant contends that the Plaintiff's memory was in fact intact more times than it was impaired, and while the Plaintiff's concentration was found to be impaired one more time than intact, on balance, the ALJ's statements are supported by substantial evidence.

In the Plaintiff's Reply, the Plaintiff asserts that the Defendant raised arguments and evidence that were never asserted by the ALJ in an effort to rationalize the Commissioner's action in a post hoc manner. The Plaintiff also asserts that Program Operations Manual requires that, in cases of mental limitation, the ALJ "should discuss the case with a psychiatrist or psychologist to learn whether a significant part of the evidence had been previously overlooked or underrated." The Plaintiff asserts therefore that the ALJ must have a qualified psychiatrist or psychologist review the medical data pertaining to mental impairments because, as a lay person, the ALJ is not able to discern the medical significance of that data.

The Defendant responds that the Plaintiff misinterprets the Program Operations Manual, and the ALJ was not required to consult with a psychiatrist or psychologist.

The undersigned is not persuaded by the Plaintiff's argument. Given that the Court may not reweigh evidence or substitute its judgment for that of the ALJ, even if the evidence "preponderates" against the Commissioner's decision, the undersigned finds

that the ALJ properly considered the relevant evidence. While the Plaintiff may disagree with the ALJ's interpretation of the evidence of record, and the ALJ's ultimate conclusion, the ALJ's decision was supported by substantial evidence. The ALJ examined the evidence of record (evidence that the Plaintiff never previously asserted was unreliable) and determined that the severity of the Plaintiff's mental impairments did not meet or medically equal a listing. The Plaintiff does not offer any legal support for the contention that the ALJ is precluded from considering the evidence and coming to a conclusion that is different than that of the Plaintiff's mental healthcare provider. A review of the ALJ's decision shows that the ALJ cited to the record in support of his contention that the Plaintiff had moderate restrictions in activities of daily living, social functioning, and concentration, persistence, and pace. Despite the Plaintiff contention that the report given by the Plaintiff on March 8, 2013 should not be relied upon, the Plaintiff does not provide any indication that the report is inaccurate. Additionally, the ALJ relied on the Plaintiff's own testimony at the hearing, and treatment notes in reaching his conclusion. The ALJ also relied upon the assessment completed by the Commission's consulting psychologist. (R. 26, 38). In the ALJ's decision, the ALJ states that he accorded some weight to the opinion offered by the reviewing psychologist that the Plaintiff could understand, retain, carry out instructions, and cooperate effectively with coworkers in completing simple tasks and transactions. (R. 38-39). The ALJ also stated that his finding of moderate limitations in social functioning was "consistent with the opinion of the DDS reviewing psychologists at the initial and reconsideration levels." (R. 26). The citations to the reviewing psychologist's report, combined with his explanation for rejecting the opinion of the treating physician, support the contention that the ALJ developed his opinion based upon the evidence in the record and did not usurp proper medical judgment in this case.

In terms of the necessity for the ALJ to discuss cases of mental limitations with a psychiatrist or psychologist, the Program Operations Manual System cited by the Plaintiff requires this consultation only when an ALJ has determined that there is a "substantial loss of ability to meet any of the basic mental demands required of unskilled work." Program Operations Manual Systems DI 25020.010. Here, the ALJ did not find that the Plaintiff had such a substantial loss so conferral with a psychiatrist or psychologist was not necessary.

In conclusion, the undersigned finds that the ALJ provided the reviewing court sufficient reasoning to examine the ALJ's decision, and the decision is supported by substantial evidence.

    **B.** <u>Plaintiff's Argument Regarding the ALJ's Analysis of Treating Psychiatrist Priscilla Borrego, and Treating ARNP, Ms. Pauline Peterkin</u>

    **1.** <u>Ms. Peterkin's Psychiatric Evaluation</u>

On August 28, 2014, Ms. Peterkin completed a psychiatric evaluation and medical assessment form. (R. 719-728). The report was co-signed by Dr. Borrego. (R. 727). The report states that the Plaintiff was treated at Community Health of South Florida from October 4, 2011 through the date of the report. Ms. Peterkin found that the Plaintiff's impairments were likely to produce "good days" and "bad days" and estimated that on average the Plaintiff would likely be absent from work more than four times a month as a result of the Plaintiff's impairments. (R. 719). Ms. Peterkin stated that the Plaintiff would likely to be off task more than 50% of the time during an eight-hour workday and did not have the capacity to function in sustained daily work on an eight hour day, five days a week because the Plaintiff had unpredictable behavioral symptoms such as mood swings, emotional outbursts, depressed mood, increased anxiety accompanied by anxiety attacks, and delusional thoughts. (R. 720). Ms. Peterkin found that the Plaintiff's symptoms affected the Plaintiff's interpersonal relationships with others, and the Plaintiff

is easily distracted, has poor problem solving skills, and needs close supervision with the activities of daily living. (R. 720). Ultimately, Ms. Peterkin found that the Plaintiff had marked restrictions in activities of daily living, social functioning, and maintaining concentration, persistence or pace. (R. 726).

## 2. Position of the Parties

The Plaintiff asserts that the ALJ rejected the combined medical source opinions of the Plaintiff's treating psychiatrist and treating ARNP without providing an adequate basis for doing so. The Plaintiff argues that the ALJ failed to identify any important inconsistencies or contradictions of any kind warranting a rejection of the opinions of Dr. Borrego and Ms. Peterkin. The Plaintiff contends that none of the contemporaneous treatment notes are inconsistent with or contrary to the opinions expressed by Dr. Borrego and Ms. Peterkin. The Plaintiff points to the Plaintiff's GAF[4] scores in support of her contention that the treatment notes are consistent with the opinion of Dr. Borrego and Ms. Peterkin. Finally, the Plaintiff asserts that other than the ALJ's own unsubstantiated and improper medical judgment, the ALJ does not and cannot cite to any significant contrary evidence.

The Defendant asserts that the ALJ properly evaluated the medical opinion evidence as the ALJ articulated good cause for discounting the opinion of Dr. Borrego and Ms. Peterkin. The Defendant argues that the ALJ pointed out inconsistencies between Ms. Peterkin's medical assessment form and the contemporaneous treatment

---

[4] The GAF Scale is a numeric scale that mental health physicians and doctors previously used to rate the occupational, psychological, and social functioning of adults. *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* ("DSM-IV") Multiaxial Assessment (rev. 2000). In the Fifth edition of the DSM, published in 2013, the use of the GAF scale was discontinued. For a discussion of why the GAF was discontinued, including citations to studies regarding its unreliability, see Victoria E. Kress, et al., *The Removal of the Multiaxial System in the DSM-5: Implications and Practice Suggestions for Counselors*, The Professional Counselor, Jul. 2014, *available at* http://tpcjournal.nbcc.org/the-removal-of-the-multiaxial-system-in-the-dsm-5-implications-and-practice-suggestions-for-counselors/.

notes. As related to the GAF scores, the Defendant asserts that the ALJ properly considered the scores, gave them some weight, and as the ALJ explained, the Commissioner has declined to endorse the GAF scale for use in Social Security and disability programs. The Defendant also asserts that the ALJ properly relied on the evidence of record in evaluating the opinion of Ms. Peterkin, and contends that the Plaintiff does not offer any authority in support of the Plaintiff's position that the ALJ substitutes his or her opinion for the physician's opinion by evaluating a physician's opinion in accordance with the Commissioner's rulings and regulations.

### 3. The Framework For Analyzing Medical Opinions

An ALJ is required to consider and explain the weight given to different medical doctors such as examining and consulting physicians. *See McCloud v. Barnhart*, 166 F. App'x 410, 419 (11th Cir. 2006). The opinion of a treating physician as to the nature and severity of an impairment is entitled to controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 416.927(c)(2).

The regulations also list the factors that the ALJ is to consider when weighing the opinions of all opinion evidence, including the opinions of consulting and examining physicians. 20 C.F.R. §§ 404.1527(c), 416.927(c). Such factors include the treating and examining relationship, length of treatment, supportability, consistency, and specialization. *Id.* In *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011), the Eleventh Circuit Court of Appeals concisely set forth the following guidelines to apply in evaluating an ALJ's treatment of medical opinions:

> Absent "good cause," an ALJ is to give the medical opinions of treating physicians substantial or considerable weight. Good cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. With good cause, an ALJ may disregard a treating

physician's opinion, but he must clearly articulate the reasons for doing so.

Moreover, the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor. In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence. Therefore, when the ALJ fails to state with at least some measure of clarity the grounds for his decision, we will decline to affirm simply because some rationale might have supported the ALJ's conclusion.

(internal quotation marks and citations omitted).

The ALJ is required "to state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error." Kahle v. Comm'r of Soc. Sec., 845 F. Supp. 2d 1362, 1271 (M.D. Fla. 2012) (citing Sharfarz v. Bowen, 825 F. 2d 278, 279 (11th Cir. 1987)). Additionally, the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician. Id.

### 4. The ALJ's Analysis of the Consulting and Examining Psychologists' Opinions Regarding the Plaintiff's Mental Limitations

The ALJ discussed the opinion of Ms. Peterkin and ultimately concluded that the contemporaneous treatment notes by Ms. Peterkin did not support her opinion. (R. 36). The ALJ cited to evidence in the record in support, for example, the ALJ stated that although Ms. Peterkin opined that the Plaintiff had poor or no ability to relate predictably in social situations, interact with others, including co-workers, the Plaintiff was described as cooperative throughout the treatment notes. The ALJ pointed out that at other times the Plaintiff reported that she was more outgoing and that she was walking with her neighbor went grocery shopping with her husband, and socialized primarily with her husband and neighbors. (R. 36). As related to Ms. Peterkin's opinion that the Plaintiff had poor to no ability to function independently, the ALJ pointed to treatment

notes that found that the Plaintiff was able to care for herself. (R. 36). The ALJ also stated that while Ms. Peterkin opined that the Plaintiff lacked the ability to understand, remember, and carry out simple job instructions, the treatment notes indicated that the Plaintiff was alert and well oriented. (R. 36). The ALJ also stated that while Ms. Peterkin opined that the Plaintiff had only a fair ability to maintain personal appearance, the record indicated that the Plaintiff was well groomed and the Plaintiff testified at her hearing that she retained the ability to care for herself. (R. 36). Finally, the ALJ noted that Ms. Peterkin completed a form on the effect of alcohol and drug abuse indicating that the Plaintiff did not have a past or present history of abuse. (R. 36). The ALJ pointed out that the record reflected that the Plaintiff reported to Ms. Peterkin that the Plaintiff stopped drinking in January 2013. (R. 36). Ultimately, the ALJ accorded no weight to the opinion offered by Ms. Peterkin, under the supervision of Dr. Borrego. (R. 38).

As related to the GAF scores assigned in the treatment notes by Ms. Peterkin, the ALJ accorded the scores some weight while noting that the Commissioner has declined to endorse the GAF scale for use in Social Security and SSI disability programs, and has indicated that GAF scores have no direct correlation to the severity requirements of the mental disorder listings. (R. 38).

A review of the record supports the Defendant's contention that the ALJ properly considered the opinion of the treating ARNP and the overseeing psychiatrist. The ALJ clearly articulated the reasons for discounting the opinion included in the psychiatric report and pointed out where the report was inconsistent with the treatment notes of record and/or the testimony of the Plaintiff. The inconsistencies between the treatment notes and the psychiatric report amount to good cause for discounting the opinion. While the undersigned notes that some of the conclusions drawn by the ALJ based on the treatment notes may be a bit tenuous, *e.g.* cooperation in treatment corresponding to the Plaintiff's ability to interact with coworkers, given the standard of review by this

22

Court, it would not be proper for the undersigned to reweigh the evidence to determine whether a different conclusion should have been reached by the ALJ, especially given the fact that substantial evidence supports the ALJ's conclusion. Finally, as related to the ALJ's treatment of the Plaintiff's GAF scores, as stated by the Defendant, the Commissioner has declined to endorse the GAF scale for "use in Social Security and SSI disability programs." See 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000). While the Plaintiff's GAF scores may support the Plaintiff's contention that the opinion should not be discounted, given the Commissioner's position regarding the use of GAF scores, and the discontinuation of the use of GAF scores in DSM V due in part to their unreliability, the ALJ did not commit error by relying upon other evidence in the record in support of his decision.

In conclusion, the ALJ did not improperly discount the opinion of the Plaintiff's treating psychiatrist and ARNP.

### C. ALJ's Residual Functional Capacity Assessment

The Plaintiff asserts that the ALJ's analysis of the Plaintiff's residual functional capacity is not based on substantial factual evidence, and argues that the ALJ failed to support the functional assessment with an appropriate medical source statement from either a treating or examining source. The Plaintiff argues that the ALJ's finding that the Plaintiff is physically capable of performing medium work is not based on substantial evidence. The Plaintiff asserts that the evidence shows that that the Plaintiff suffers from "right knee impairment and bilateral L5 spondylosis, Grade 1 anteriolistheis, of L5 over S1, and severe degenerative disk changes. While Ms. Zerba is not currently engaging in significant complications from her spinal impairments, she is not currently engaging in significant exertional activities, such as those required at the medium level of exertion." ECF No. [21] at 14. With regard to the Plaintiff's mental limitations, the Plaintiff also argues that once the ALJ rejected the opinion of the Plaintiff's treating ARNP, there was

no other evidence to support the ALJ's functional findings, and therefore the ALJ's functional assessment amounted to an improper substitution of the ALJ's medical judgment for that of the treatment providers.

The Defendant asserts that the ALJ was not required to rely on the functional assessment of a treating or examining physician to support the ALJ's RFC finding. The Defendant argues that the case law relied upon by the Plaintiff is misplaced and the absence of an opinion from an acceptable medical source does not preclude an ALJ from making a proper RFC determination.

As related to the ALJ's analysis of the Plaintiff's physical RFC, while the Plaintiff contends that the exertional limitations are not consistent with the actual facts of the case, the ALJ accorded "some weight to the opinion of the DDS reviewing physician who opined that the claimant retained the ability to perform sustained work activity at the medium exertional level." (R. 39). The reviewing physician's report which is based upon the medical records in evidence, counters the Plaintiff's argument that there is no evidence in the record to support the ALJ's physical RFC determination. Additionally, because the Plaintiff admits that the Plaintiff is not experiencing significant complications from her spinal impairments, substantial evidence supports the ALJ's determination that the Plaintiff has the RFC to perform medium work.

The undersigned also finds that the ALJ did not err by not ordering a consultative examination in the development of the Plaintiff's Mental RFC. The assessment of the Plaintiff's RFC is the responsibility of the ALJ and should be based upon a review of all relevant evidence. 20 C.F.R. § 404.1527(d)(2). "The ALJ has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the ALJ to make an informed decision." *Robinson. v. Astrue*, 365 F. App'x 993, 995 (11th Cir. 2010) (internal citations omitted). Here, the record was fully developed as there were treatment notes spanning several

years, testimony by the Plaintiff, contact by the Plaintiff with the Commission, and a reviewing physician and psychologist. Therefore, the undersigned concludes that a consultative examination was not necessary for the ALJ to make an informed decision based upon the evidence of record. *See Castle v. Colvin,* 557 F. App'x 849, 853 (11th Cir. 2014) (holding that no consultative examination is necessary where ALJ reviewed cited evidence in the record in support of his opinion).

In conclusion, substantial evidence supported the ALJ's RFC, and the ALJ was not required to request a statement from a consultative medical source.

### D. ALJ's Hypothetical

The Plaintiff asserts that the ALJ failed to pose a hypothetical question comprising all of the Plaintiff's acknowledged limitations in daily activities, social functioning, and concentration, persistence or pace. The Plaintiff argues that stating the Plaintiff is capable of performing simple, routine repetitive tasks does not adequately address the Plaintiff's moderate limitations in concentration, persistence, or pace or any of the Plaintiff's moderate limitations in daily activities or social functioning.

The Defendant asserts that the ALJ's hypothetical was complete as it included that the Plaintiff was capable of interaction appropriately with supervisors and occasionally with co-workers and the public despite limitation in social functioning. The Defendant also argues that the ALJ's hypothetical properly accounted for the Plaintiff's moderate difficulties in concentration, persistence, or pace.

As described above, the ALJ presented the following hypothetical to the VE:

> Please assume an individual, same age, education, past work experience as the claimant. Further assume such individual would be limited to medium exertion work as described in the Dictionary of Occupational Titles. Additionally, assume such an individual could not climb ladders, ropes or scaffolds; could only occasionally climb ramps or stairs. Could not crawl. Would be unable to perform complex and detailed tasks due to limitations in concentration, persistence and pace, but could perform simple, routine, competitive,

repetitive tasks on a sustained basis over a normal eight hour work day with no more than simple decision-making required. And is capable of interacting appropriately with supervisors and occasionally with co-workers and the public despite limitations in social functioning.

(R. 72)

Under the standard established by the Eleventh Circuit, the ALJ is required to account for limitations in concentration, persistence and pace when presenting a hypothetical to the VE. *Winschel* at 1181. In *Winschel*, the Court found that the hypothetical presented to the VE was inadequate as the ALJ failed to either implicitly or explicitly account for the claimant's limitations in concentration, persistence and pace.[5] Here, the ALJ explicitly made the VE aware that the Plaintiff had limitations in concentration, persistence, and pace, and limited the hypothetical accordingly. In terms of the Plaintiff's moderate limitation in daily living and social functioning, the ALJ incorporated the social functioning component by limiting interaction with co-workers to only occasionally.

Accordingly, the undersigned finds that the ALJ appropriately included the Plaintiff's limitations in the hypothetical presented to the VE.

### E. Testimony of the Vocational Expert

The Plaintiff asserts that the Plaintiff's disability is established by the testimony of the vocational expert because when presented with a hypothetical where the individual would be absent from work more than four times a month and also would be off task more than 50 percent of an eight hour workday, the VE responded that such all work would be eliminated.

---

[5] The Plaintiff cites to *Lea v. Comm'r of Soc. Sec.*, 776 F. Supp. 2d 1309 (M.D. Fla. 2011) for the proposition that the ALJ did not adequately account for the Plaintiff's limitations in the hypothetical. However, besides the fact that the VE opinion is not binding on this Court, the case at bar can be distinguished as here the ALJ explicitly stated to the VE that the Plaintiff had limitations in concentration, persistence and pace.

The Defendant asserts that the VE's testimony only proves that the Plaintiff would be considered disabled only when presented with a hypothetical that included the limitations included in the opinion of the treating ARNP, and those limitations were properly evaluated and rejected by the ALJ.

Because, as discussed above, the ALJ properly excluded the opinion of the ARNP, the ALJ was not required to include those limitations in the hypothetical presented to the VE. *Crawford* at 1161. The undersigned finds the fact that the ALJ presented an alternative hypothetical which included the limitations asserted by the ARNP does not convert the ALJ's finding of non-disability into one of disability.

### F. The ALJ's Credibility Analysis

The Plaintiff asserts that the ALJ committed reversible error because the ALJ's assessment of the Plaintiff's credibility is not based on any discernable evidence as the ALJ failed to identify any relevant contradictory evidence warranting the ALJ's finding. The Plaintiff also asserts that by conducting the credibility analysis after his assessment of the Plaintiff's ability to work, the functional assessment is effectively rendered meaningless.

The Defendant contends that the ALJ properly considered the Plaintiff's subjective complaints and found them not fully credible. The Defendant also asserts that the case law relied upon by the Plaintiff for the assertion that the credibility analysis must be performed before assessing the Plaintiff's ability to work is misplaced as there is not any evidence that this is what the ALJ did; nor did the ALJ use boilerplate language in making his credibility determination.

The responsibility of the fact-finder, the ALJ, is to weigh the Plaintiff's complaints about her symptoms against the record as a whole; it falls to the ALJ alone to make this determination. 20 C.F.R. § 404.1529(a). A clearly articulated credibility finding supported by substantial evidence in the record will not be disturbed by a reviewing court. *Foote v.*

*Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). "[T]he ALJ's discretionary power to determine

the credibility of testimony is limited by his obligation to place on the record explicit and

adequate reasons for rejecting that testimony." *Cannon v. Bowen*, 858 F.2d 1541, 1545

(11th Cir. 1988). If the ALJ decides not to credit such testimony, he must articulate

explicit and adequate reasons for doing so. *Hale v. Bowen*, 831 F. 2d 1007, 1011 (11th

Cir. 1987).

Here the ALJ found that the Plaintiff's medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, the Plaintiff's

statements concerning the intensity, persistence and limiting effects of these symptoms

were found to be not entirely credible. (R. 36). The ALJ spent nearly two pages of his

decision detailing the inconsistences between the Plaintiff's allegations and the record

evidence. (R. 36-38). For example, the ALJ pointed out that the Plaintiff's treatment

records showed that the Plaintiff responded well to treatment for her depression and

anxiety, and for the most part the Plaintiff's memory and concentration were intact. (R.

37). The ALJ also cites to evidence that during the relevant time period the Plaintiff

reported that she was able to care for herself and care for her animals. (R. 37). The

undersigned finds that the ALJ provided a clearly articulated credibility finding that was

supported by citations to the record evidence.[6] Additionally, the Plaintiff's assertion that

the ALJ is required to perform a credibility assessment before forming his opinion

regarding the Plaintiff's ability to work does not succeed. In the case cited by the

Plaintiff, *Bjorn v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012,) the court found that the ALJ's

credibility assessment was flawed when the ALJ failed to cite to evidence in the record in

---

[6] The Plaintiff contends that the ALJ attempted to refute perceived statements about liver
disease, hypertension, and heart impairment while the Plaintiff never attributes any
significant problems to these impairments. However, while the ALJ does address the
record evidence as related to those medical conditions, the ALJ spends the bulk of his
credibility assessment addressing the Plaintiff's allegations as related to mental
impairments.

determining that the claimant's complaints were not credible. *Bjorn v. Asture*. Here, in contrast, while the ALJ used similar language to the ALJ in *Bjorn*, the ALJ cited to record evidence which allowed this Court to review the ALJ's decision. As related to the Plaintiff's contention that the ALJ performed a credibility analysis after determining the Plaintiff's ability to work, apart from the organization of the ALJ's decision there is no further evidence that the ALJ's decision was improper.

Accordingly, the undersigned finds that the ALJ did not err in performing his credibility analysis, and the ALJ's finding is supported by substantial evidence.

VI.    **CONCLUSION**

Based on the foregoing, this Court finds that substantial evidence supports the ALJ's determination that the Plaintiff is not disabled. Therefore, in accordance with the above, it is herby

**ORDERED AND ADJUDGED** that the Plaintiff's Motion for Summary Judgment, ECF No. [21], is **DENIED**, and that Defendant's Motion for Summary Judgment, ECF No. [24], is **GRANTED.**

**DONE AND ORDERED** in chambers in Miami, Florida on September 25, 2017.


*Andrea M. Simonton*
_____
ANDREA M. SIMONTON
CHIEF UNITED STATES MAGISTRATE JUDGE

Copies provided via CM/ECF to:
All counsel of record